## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

KEITH BARTHELEMY                                    CIVIL ACTION

VERSUS                                              NO. 12-2335

N. BURL CAIN, WARDEN                                SECTION "E"(5)

### REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. §§636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases. Upon review of the entire record, the Court has determined that a federal evidentiary hearing is unnecessary. See 28 U.S.C. §2254(e)(2).[1] For the following reasons, the Court recommends that the instant petition for habeas corpus relief be **DISMISSED WITH PREJUDICE.**

---

[1]Under 28 U.S.C. §2254(e)(2), whether to hold an evidentiary hearing is a statutorily mandated determination. Section 2254(e)(2) authorizes the district court to hold an evidentiary hearing only when the petitioner has shown either that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, 28 U.S.C. §2254(e)(2)(A)(i), or the claim relies on a factual basis that could not have been previously discovered by exercise of due diligence, 28 U.S.C. §2254(e)(2)(A)(ii); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner. 28 U.S.C. §2254(e)(2)(B).

I.   <u>FACTUAL AND PROCEDURAL BACKGROUND</u>[2]

The petitioner, Keith Barthelemy, is a convicted inmate currently incarcerated in the Louisiana State Penitentiary, Angola, Louisiana.  On October 31, 2002, a grand jury returned a true bill, charging Barthelemy, along with Danny Scott, with the first degree murder of Troy Cacioppo.[3]   The State subsequently reduced Barthelemy's charge to second degree murder.  The Louisiana Fourth Circuit Court of Appeal summarized the facts of the case as follows:

> At trial, Crystal Smith, an acquaintance of Troy Cacioppo who was with Troy on the evening of the murder, testified and provided an account of the night's events. On the evening of August 27, 2002, Ms. Smith ran into Mr. Cacioppo on Bourbon Street, where the two exchanged numbers.   Later that evening, Ms. Smith called Mr. Cacioppo from a restaurant in Metairie and requested a ride.   Mr. Cacioppo picked Ms. Smith up, and the two drove to the lakefront, at Lakeshore Drive, got out of the car and chatted.   Shortly thereafter, Ms. Smith observed two teenage boys approach.  She estimated their ages to be around sixteen years.
> The boys requested a light, and Mr. Cacioppo provided one.   Mr. Cacioppo then asked if they had marijuana, and small talk ensued.   Ms. Smith then observed Defendant take a firearm from his waistband, point it at Mr. Cacioppo, and demand his car keys, which were in the ignition.   After Mr. Cacioppo refused, Ms. Smith testified that Defendant shot Mr. Cacioppo in the

_____

[2]A portion of the procedural history was ascertained from the Louisiana Fourth Circuit's opinion, <u>State v. Barthelemy</u>, 32 So.3d 999 (La. App. 4th Cir. 2/24/10).  St. Rec. Vol. 4 of 6.

[3]Danny Scott later pleaded guilty to a reduced charge of manslaughter in exchange for his testimony against Barthelemy.

neck.[4]   As he choked on his own blood, Mr. Cacioppo
looked at Ms. Smith, pleading for help, lying upside down
on the seawall steps, his head near the water.   Defendant
walked down the steps and shot at Mr. Cacioppo again, but
missed.   Defendant then demanded his car keys again;
however, Mr. Cacioppo was choking on his own blood and
could not respond.   Defendant shot at Mr. Cacioppo a
third time; this shot hit him.   Ms. Smith testified that
she saw Mr. Cacioppo's eyes as he died.[5]

Defendant then turned to Ms. Smith, threatening to
kill her as well, at which time Ms. Smith ran away,
crossing Lakeshore Drive, and heard the car drive off
soon thereafter.   Ms. Smith testified that she eventually
made it to a house where the occupants called the police
while she waited outside.[6]   The police arrived
approximately five minutes later.

---

[4]With regard to Danny Scott, Ms. Smith testified that after the
first shot, Scott demanded money from Ms. Smith.   Ms. Smith became
angry and cursed in response.   Ms. Smith observed that Scott's body
movement indicated he did not want to be involved in the situation,
especially after the first shot.

[5]Dr. William P. Newman, III, the coroner pathologist who
conducted the autopsy on Troy Cacioppo's body, also testified at
trial.   According to his testimony, Troy suffered two gunshot
wounds—one to the neck and one to the left flank.   He died from the
neck wound.   However, the flank wound "complicated" the fatal
injury.   Troy also suffered extensive hemorrhaging in the neck and
fractured cervical vertebrae at C-4 and C-5.   The bullet entering
the flank creased the kidney, causing extensive hemorrhaging in
that area.   All of these injuries contributed to Troy's death.   Dr.
Newman explained that there may have been a chance of surviving the
first gunshot wound.   A neurologist would have to make that
determination.   However, the second gunshot wound eliminated any
such chance of survival.   Dr. Newman removed a bullet from the
cervical vertebra and several chain fragments from the neck.   This
evidence was introduced at trial.

[6]At trial, Kathy Robertson authenticated a recording of an
August 28, 2002 emergency 911 call, which was played for the jury
over the defense's objection.

3

Ms. Smith returned to the lakefront with the responding officers. Several casings[7] and a Jesus Medallion that Troy had worn were recovered at the crime scene, and Mr. Cacioppo's body was recovered from the water. Detective Troy Williams subsequently took Ms. Smith to the police station, where she provided her account of what had occurred. The next day, Ms. Smith provided a description of the shooter—Defendant—to a sketch artist.

At trial, Ms. Smith expressed some confusion over the timing of two photographic lineups that were presented to her. She was presented one lineup while at the police station, immediately after the shooting, and was presented another lineup while she was at work. Though she did not know his name at the time of the identification and did not remember the timing of the identification, Ms. Smith testified that she had no doubt that Defendant was the shooter. She explained in court that "I'll never forget that face or his eyes."[8]

On cross examination, Ms. Smith admitted that she may have smoked marijuana earlier in the day on the date of the murder. When asked about answering negatively to the question, "[i]s that the first time you ever met [Mr. Cacioppo]," Ms. Smith explained that she may not have understood the question, which was asked during testimony before the grand jury. Ms. Smith further testified that she was interviewed by Detective Troy Williams at approximately 6:00 a.m. on the morning after the shooting. At that time, she described one of the boys as taller and darker than Defendant, the shooter. Ms. Smith admitted that she could have been mistaken about heights and ages, as she had previously indicated that Defendant

---

[7]Officer Carl Palmer, of the New Orleans Police Department's Crime Lab, testified that he arrived at the crime scene at approximately 4:30 a.m. on August 22, 2002, and processed the scene on Lakeshore Drive. Officer Palmer took photographs of the scene and recovered the following physical evidence: a spent casing from a .380 automatic and a silver colored medallion of Jesus with a glass stone in it. A sketch of the scene was also drawn. Sergeant Robert Blanchard, also of the New Orleans Police Department, testified at trial that a projectile was the only physical evidence remaining in this case after Hurricane Katrina.

[8]Ms. Smith further testified, "Y'all need to know: he's the murderer."

4

was a little shorter.  Ms. Smith affirmed that she had described the shooter as being 5'2" tall and young, close to sixteen years old.

Homicide Detective Troy Williams investigated the murder of Troy Cacioppo.  Det. Williams testified that when he arrived on the scene, Mr. Cacioppo's body had been recovered and placed face up on the seawall.  Sergeant Scanlan[9] was the first officer on the scene and briefed him.  Det. Williams learned from Officer Jamie Freeman that a couple was sitting in a vehicle not far from the crime scene when the murder occurred.  Upon interviewing the couple, Det. Williams learned that they drove away when they heard gunshots.  As they drove away, they observed two individuals fleeing.  The female "was pretty sure" the fleeing suspects were male.  The male could not make a determination.  Both observed two cars flee; the female thought they were driving a Pontiac Grand Prix with large chrome wheels and a lighter colored Oldsmobile Cutlass.  Neither witnessed the shooting.

Det. Williams testified regarding his interview with Ms. Smith at the police station.  Ms. Smith relayed her story of running into Mr. Cacioppo, exchanging numbers, and driving to the lakefront, where they sat and talked.  Two black males approached, and a short conversation took place.  Then, one of the males produced a gun and demanded the car keys.  Mr. Cacioppo refused to comply, and the male with the gun shot him.  The other male told Ms. Smith not to run, or she would be killed too.  Mr. Cacioppo fell partially into the water, and the gunman continued demanding the car keys while rummaging through his pockets.  Ms. Smith heard another shot and fled to a

---

[9]Sergeant Danny Scanlan also testified at trial.  At approximately 3:40 a.m. on August 28, 2002, Sergeant Scanlan was dispatched to Stilt Street, in the Lake Vista area.  There, a distraught young woman—Crystal Smith-related that a robbery and shooting had occurred at the lakefront.  He and Ms. Smith drove to the lakefront, where a shell casing and a medallion-like piece of jewelry were discovered by the seawall.  A green car they were looking for was not there.  Sergeant Scanlan walked down to the water and saw something bobbing, and discovered that it was the body of Ms. Smith's companion.  Sergeant Scanlan recalled that Mr. Cacioppo had a dragon tattoo on his chest and a tattoo that said "Little Troy" on his right arm.  Once homicide detectives arrived, Sergeant Scanlan returned to patrol.

house in Lake Vista, where the first responding officers encountered Ms. Smith.

Det. Williams further testified that Ms. Smith described the two males as two young black males, wearing blue jeans and white t-shirts. One was taller than the other and one was armed. Det. Williams subsequently took Ms. Smith to a sketch artist, at which time sketches were made of both perpetrators. An additional sketch was made just of their figures, to show the slight height difference between the two of them.

Ms. Smith advised Det. Williams that her cell phone was in Troy's car when it was stolen. When the cell phone provider was contacted, it was discovered that several calls were made to Ms. Smith's phone after the shooting. The phone records also showed that a call was made from Ms. Smith's phone to a number that had called her phone. A call had been made from Ms. Smith's phone to a number listed to the name, "Danny Scott," at approximately 5:37 a.m. The number belonged to Danny Scott, Sr., but Danny Scott, Jr. lived at the same address. A search of that name produced a Danny Scott who was fifteen or sixteen years of age. Another number was connected to a Carondolet Street address in Uptown. The occupant of the Carondolet Street address had returned a call from Ms. Smith's phone number.

After receiving Mr. Cacioppo's car information from his mother and step-brother, Det. Williams had this information broadcast by police communications. Troy drove a green Pontiac Grand Prix.[10] Det. Williams was informed that a car fitting the description was discovered next to a Selma Street address, in New Orleans East. The police department was also informed that the same vehicle was seen in the rear yard of 4851 Viola Street, and received information that a person driving a white Mustang was seen attempting to strip or remove the vehicle discovered on Selma Street. The Grand Prix was damaged; the stereo and other items were missing. It was identified as Mr. Cacioppo's car by the VIN number.[11]

---

[10]Yolanda Bradshaw, Troy Cacioppo's mother, testified at trial that Troy owned a green Grand Prix that was in very good condition.

[11]Sylvia Mena testified at trial; she and Troy Cacioppo have a son together, Troy Cacioppo, Jr. On the evening of August 27, 2002, Troy and Ms. Mena spoke at approximately 5:00 or 6:00 p.m., at which time Troy indicated that he wanted to pick up Troy, Jr. so

While Mr. Cacioppo's car was being recovered, the white Mustang was also seen at a towing business on Chef Menteur Highway. A man was seen exiting the Mustang and getting into a nearby pickup, where he conversed with another man. The driver of the Mustang was an individual by the name of Harold Green. The other man in the pickup was Kim Evac. Mr. Evac had been called about moving Troy's car from Viola Street, but did not want to get involved. After the police interviewed Mr. Green, a warrant to search 4851 Viola Street was obtained.

Execution of the warrant at 4851 Viola Street produced the following evidence: several stereo components, a pistol box, some ammunition, and a wallet found in the top dresser drawer in a bedroom. The wallet contained items marked with Troy Cacioppo's name. The bedroom was that of Lakeisha Williams. As a result of talking to Ms. Williams, Det. Williams learned that Mr. Cacioppo's car had been driven to the Viola Street address and placed in the back yard by "Keith" or "Danny." Scott had apparently placed the wallet in Ms. Williams' room. Danny Scott was approximately fifteen or sixteen years old and had lived uptown.

Det. Williams subsequently developed a photographic lineup with Danny Scott in it, and presented it to Ms. Smith on August 29, 2002. Ms. Smith identified Danny Scott as the subject who had threatened she would be killed if she ran. Scott was arrested shortly thereafter.

At the Juvenile Intake Center at police headquarters, Scott's father was called and requested to come to the station. Once Scott's father arrived, both were informed that Scott was being charged with first degree murder, and Scott was advised of his

---

they could work on Troy's car together. Arrangements were made for Troy to pick up Troy, Jr., but Troy never appeared. Ms. Mena received a call from Ms. Bradshaw on the morning of August 28, 2002, informing her of Troy's passing.

Ms. Mena identified Troy's car in several pictures. She explained that Troy kept the vehicle in perfect condition. The vehicle was in that condition when she saw it the Saturday before Troy's passing. However, the car in the pictures presented at trial showed a car that was scratched and dirty and from which the rims had been removed. Ms. Mena had no personal knowledge of the circumstances under which the car descended into the condition depicted in the photographs.

constitutional rights.   While Det. Williams spoke to
Danny Scott and Mr. Scott, another officer developed
information on the Defendant.  A photographic lineup was
then prepared, and Det. Williams and Sergeant Waguespack
proceeded to Ms. Smith's place of employment, where they
showed her the lineup.  She immediately identified
Defendant as the person who shot and killed Mr. Cacioppo.

At the time of his arrest, Defendant was 5'5" tall
and weighed approximately 150 pounds, and was twenty-one
years old.  Scott was slightly shorter and skinnier at
the time of his arrest — 5'4" tall and approximately 125
pounds.

On cross examination, Det. Williams was asked about
Ms. Smith's August 28, 2002 statement within a few hours
of the incident.  Det. Williams acknowledged that on
August 28, 2002, Ms. Smith had described the shooter as
5'2" in height and young, sixteen, and described the
non-shooter as taller and darker.

Danny Scott, who was sixteen years old at the time
of the murder, also testified at trial.  Scott testified
that Reginald Williams and Defendant picked him up at his
home on Bullard Avenue in New Orleans East just before
midnight on August 28, 2002.  Although Scott had known
Williams for four or five months, he met Defendant for
the first time on the night of the murder.[12]  Williams
drove the three of them to the lakefront at approximately
three or four in the morning to search for drugs.

Scott testified that when they arrived at the
lakefront, Williams admired another car there as the
three of them sat on the hood of Williams' car.
Defendant and Scott then walked over to a man and a woman
who were parked approximately half a street block to a
full street block away to request a light while Williams
remained in his car, talking on the phone.  As they
approached the couple, the man touched Scott on the
bottom of his pants leg and asked whether he had
marijuana.  At that time, Defendant requested a light,
and as the man produced a lighter, Defendant removed a
gun — a .380 — from his back pocket, and demanded the
man's car keys.  Scott testified that when the man
refused, Defendant shot him, at which time the man fell,
leaving half of his body in the water.  Shocked, Scott
testified that he took several steps back into the

---

[12]Scott identified Defendant in court, as well as a photograph
of the victim.

8

street; he knew that Defendant had a gun, but did not anticipate this turn of events.[13]  The woman ran away. Scott testified that Defendant continued to demand car keys from the male victim, rummaging through the male victim's pockets.  Defendant then shot the victim a second time and proceeded to the car that had been occupied by the victim and the woman.  Scott returned to Williams' vehicle, and Defendant followed them in the victim's car.

From the lakefront, Williams and Scott drove to Williams' house on Viola Street, in New Orleans East. Approximately half an hour to an hour later, Defendant arrived at Williams' house in the victim's car, driving it into the backyard, where it got stuck in the mud.[14] Shortly thereafter, Williams' mother arrived and demanded to know about the car in the back yard.  Scott informed her that Defendant had shot a man at the lakefront and brought his car to her house.  Williams' mother called a tow truck immediately.  When the truck arrived, Defendant attempted to negotiate a sale of the car's rims to the driver; the driver refused and took the car at Ms. Williams' insistence.  Williams then drove Scott home at approximately 6:30 a.m.

That morning, Scott testified that he took a bath and went to school, where his conscience bothered him, and he told several teachers about the murder.  At approximately noon, the police came for Scott.  Scott ran from the officers, but was arrested[15] a block away from his school and taken to the Juvenile Bureau, where he gave a statement to the police.[16]  Scott denied knowledge of a call made from the female victim's cell phone to his

---

[13]Scott denied saying anything to the female stranger or threatening her, insisting that he only told the male stranger that he did not have any marijuana.

[14]Scott testified that Williams attempted to remove the hubcaps, but the screws stripped.

[15]Scott was arrested for first degree murder.

[16]Both of Scott's parents were present at the police station after his arrest. He testified that he spoke to them alone both prior to and after giving his statement.

father's house; denied ever touching the cell phone, a backpack in the vehicle, or the victim's wallet.[17]

Reginald Williams also testified at trial. Williams did not know Scott well, but had known Defendant since he moved to New Orleans East, approximately thirteen or fourteen years prior to trial, and admitted that Defendant was "something like my best friend."[18] Williams testified that he drove his car to the lakefront with Scott and Defendant on the night of the murder. At some point after they reached the lakefront, Williams received a phone call and got back into his car, while Scott and Defendant walked off together. Williams testified that he subsequently heard gunshots and ended his phone conversation, started his engine and was about to drive off when he saw Defendant run towards his car, enter the vehicle and relate that Scott was attempting to rob someone. Williams further testified that he saw Scott drive away in the victim's vehicle.

Williams drove Defendant to his aunt's house on Poland Avenue, but no one was at the Poland Avenue house, so the two boys drove to Reginald's home at 4851 Viola Street. Williams' sister, Lakeisha, was there with her boyfriend when they arrived. After Williams told Scott where he was, Scott drove the victim's car to Williams' house. When Williams' mother returned home, Scott told her that the car belonged to his uncle.

Williams testified that he subsequently saw a news story on television about a murder at the lakefront that showed the victim's car. Williams asked Scott about the story, and Scott admitted to shooting the victim, but denied knowing that he had killed the man. Williams testified that Scott said he would take responsibility for the murder, and that Defendant, Ms. Williams, and Lakeisha were present when Scott made this statement. Williams maintained that Defendant was innocent.

Williams was aware that the police discovered a wallet in his sister's bedroom, and explained that Scott

---

[17]Scott entered into a plea agreement that was recorded during his June 13, 2008 guilty plea proceedings. The agreement required that he tell the truth and not testify regarding anything that he had not said in his statement. Scott had a prior conviction for simple robbery.

[18]Williams testified that Scott and Defendant did not know each other before the night of the murder.

washed his clothes while at his house after the murder,
as they had gotten dirty when the stolen vehicle became
stuck in the mud.  Williams testified that his sister
Lakeisha washed Scott's uniform because he had to go to
school the next morning.  When confronted with his own
phone number on Ms. Smith's cell phone bill, Williams
testified that he did not make a telephone call to Ms.
Smith, but stated that he received a call from Scott the
morning after the murder, and that he did not know
Scott's telephone number.
    Williams acknowledged that he pled guilty to being
an accessory after the fact to the August 28, 2002
murder.

State v. Barthelemy, 32 So.3d 999 (La. App. 4th Cir. 2/24/10).  St.

Rec. Vol. 4 of 6.

Barthelemy pled not guilty at his arraignment on November 8,

2002, at which time Sonny Armond appeared as his attorney for

arraignment purposes only.  A November 15, 2002 hearing to appoint

counsel resulted in the appointment of Sonny Armond and Dwight

Doskey, both of the Orleans Indigent Defense Board, as Defendant's

counsel.  Also at that hearing, Kerry Cuccia was appointed to

represent Danny Scott.

On July 25, 2008, Barthelemy filed a motion in limine to

exclude the testimony of Danny Scott due to a conflict of interest,

asserting that Dwight Doskey's work with the Capital Defense

Project of Southeast Louisiana after Hurricane Katrina created a

conflict of interest, because Kerry Cuccia worked for the same

organization.  The trial court heard testimony from Mr. Doskey on

this matter at a July 30, 2008 hearing and denied the motion on August 18, 2008.

A five-day jury trial resulted in a guilty verdict.  After a November 5, 2008 sentencing hearing, Barthelemy was sentenced to life in prison, without the benefit of probation and parole.

On February 24, 2010, pursuant to Barthelemy's appeal, the Louisiana Fourth Circuit Court of Appeal affirmed Barthelemy's conviction and sentence.[19]  On October 29, 2010, the Louisiana Supreme Court denied Barthelemy's writ application.[20]

Barthelemy's conviction became final 90 days later, on January 27, 2011, when he did not file a writ application with the United States Supreme Court.  Ott v. Johnson, 192 F.3d 510, 513 (5th Cir. 1999) (period for filing for certiorari with the United States Supreme Court is considered in the finality determination under 28 U.S.C. § 2244(d)(1)(A)), cert. denied, 529 U.S. 1099 (2000); U.S. Sup. Ct. Rule 13(1).

On or about October 7, 2011, Barthelemy filed with the state district court an application for writ of habeas corpus.[21]  On

---

[19]State v. Barthelemy, 32 So.3d 999 (La. App. 4th Cir. 2/24/10). St. Rec. Vol. 4 of 6.

[20]State v. Barthelemy, 48 So.3d 1097 (La. 2010).  St. Rec. Vol. 5 of 6.

[21]St. Rec. Vol. 1 of 6.

October 17, 2011, the state district court denied relief.[22]   On December 2, 2011, the Louisiana Fourth Circuit Court of Appeal likewise denied Barthelemy post-conviction relief.[23]   On August 22, 2012, the Louisiana Supreme Court denied Barthelemy's writ application.[24]

II.   <u>FEDERAL HABEAS PETITION</u>

On September 18, 2012, Barthelemy filed the instant petition for federal habeas corpus relief asserting the following claims: (1) He was denied his constitutional right to confrontation. (2) A conflict of interest was created when his original trial counsel, Dwight Doskey, withdrew to join the Capital Defense Project, a non-profit defense firm headed by co-defendant Danny Scott's counsel, Kerry Cuccia.  (3) His constitutional rights were violated when the trial court allowed a witness, Lakeisha Williams, to invoke her right against self-incrimination.  (4) His constitutional rights were violated by virtue of the prosecutor's improper remarks during closing arguments.  (5) There was insufficient evidence to support his conviction.   In its response, the State concedes that

---

[22]St. Rec. Vol. 1 of 6.  Rec. Doc. No. 4, p. 59.

[23]<u>State v. Barthelemy</u>, No. 2011-K-1609 (La. App. 4th Cir. 12/02/11).  St. Rec. Vol. 6 of 6.  Rec. Doc. No. 4, p. 61.

[24]<u>State ex rel. Barthelemy v. State</u>, 97 So.3d 362 (La. 2012). St. Rec. Vol. 6 of 6.  Rec. Doc. No. 4, p. 62.

13

Barthelemy's petition is timely and that he has exhausted his state court remedies.[25]

III. <u>GENERAL STANDARDS OF REVIEW</u>

The AEDPA comprehensively revised federal habeas corpus legislation, including 28 U.S.C. §2254.  The AEDPA went into effect on April 24, 1996[26] and applies to habeas petitions filed after that date.  <u>Flanagan v. Johnson</u>, 154 F.3d 196, 198 (5th Cir. 1998) (citing <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997)).  The AEDPA therefore applies to Barthelemy's petition.

The threshold questions in habeas review under the amended statute are whether the petition is timely and whether the claims raised by the petitioner were adjudicated on the merits in state court; <u>i.e.</u>, the petitioner must have exhausted state court remedies and must not be in "procedural default" on a claim. <u>Nobles v. Johnson</u>, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).

---

[25]Rec. Doc. No. 14, pp. 14, 15, 20, 24, 29, 31.

[26]The AEDPA, which was signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments.  Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law.  <u>United States v. Sherrod</u>, 964 F.2d 1501, 1505 (5th Cir. 1992).

The State concedes and the Court finds that Barthelemy has overcome the above hurdles. The instant action is timely and Barthelemy has exhausted his state court remedies.

IV. <u>STANDARDS OF MERITS REVIEW</u>

28 U.S.C. §§2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law and mixed questions of fact and law in federal habeas corpus proceedings. <u>Nobles</u>, 127 F.3d at 419-20 (citing 28 U.S.C. § 2254(b) and (c)).

Determinations of questions of fact by the state court are "presumed to be correct . . . and we will give deference to the state court's decision unless it 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" <u>Hill v. Johnson</u>, 210 F.3d 481, 485 (5th Cir. 2000) (quoting 28 U.S.C. § 2254(d)(2)). The amended statute also codifies the "presumption of correctness" that attaches to state court findings of fact and the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption. 28 U.S.C. § 2254(e)(1).

A state court's determination of questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. § 2254(d)(1) and receive deference, unless the state court's decision "'was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent.]'" <u>Penry v. Johnson</u>, 215

15

F.3d 504, 507 (5th Cir. 2000) (quoting <u>Miller v. Johnson</u>, 200 F.3d 274, 280-81 (5th Cir. 2000)), <u>aff'd in part, rev'd in part on other grounds</u>, 532 U.S. 782 (2001); <u>Hill</u>, 210 F.3d at 485.  The United States Supreme Court has clarified the Section 2254(d)(1) standard as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

<u>Williams v. Taylor</u>, 529 U.S. 362, 405-06, 412-13 (2000); <u>accord</u> <u>Penry</u>, 532 U.S. at 792-93; <u>Hill</u>, 210 F.3d at 485.  "'A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state court decision applied [a Supreme Court case] incorrectly.'"  <u>Price v. Vincent</u>, 538 U.S. 634, 641 (2003) (quoting <u>Woodford v. Visciotti</u>, 537 U.S. 19, 24-25 (2002)) (brackets in original); <u>accord Bell v. Cone</u>, 535 U.S. 685, 699 (2002).  Rather, under the "unreasonable application" standard, "the only question for a federal habeas court is whether the state court's determination is objectively unreasonable."  <u>Neal v. Puckett</u>, 286 F.3d 230, 246 (5th Cir. 2002).  The burden is on the petitioner to show that the state court applied the precedent

16

to the facts of his case in an objectively unreasonable manner. _Price_, 538 U.S. at 641 (citing _Woodford_, 537 U.S. at 24-25); _Wright v. Quarterman_, 470 F.3d 581, 585 (5th Cir. 2006).

V.    RIGHT TO CONFRONTATION (CLAIM NO. 1)

     In _Melendez-Diaz v. Massachusetts_, 557 U.S. 305, 309 (2009), the Court explained:

> The Sixth Amendment to the United States Constitution, made applicable to the States via the Fourteenth Amendment, . . . provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses _against him_." In _Crawford [v. Washington_, 541 U.S. 36 (2004)], after reviewing the Clause's historical underpinnings, we held that it guarantees a defendant's right to confront those "who 'bear testimony'" _against him_.  541 U.S., at 51, 124 S.Ct. 1354.  A witness's testimony _against a defendant_ is thus inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination.  _Id_., at 54, 124 S.Ct. 1354.  [Emphasis added.]

Based on the above, Barthelemy contends that his right to confrontation was violated because the actual recorder of the 911 call reporting the incident did not testify at trial.  Instead, Kathy Robertson, a different person who worked in the 911 communications center, testified at trial.  Robertson freely admitted that she did not take the call, but rather, was "just here to authenticate the tape."[27]

---

[27]St. Rec. Vol. 4 of 6, p. 600.

As best the Court can glean from the record, Crystal Smith fled the scene of the crime in terror when given the opportunity. She ran to the home of a nearby resident in the Lakeview section of Orleans Parish in the early morning hours, banging on that person's door and requesting that the police be called because a crime had been committed.  The unnamed Lakeview resident who placed the 911 call did not testify at trial.  Nor was a transcription of the 911 tape which was played for the jury included in the current record for the Court's review.  However, Crystal Smith, at whose behest 911 was called by the Lakeview resident, did testify at trial and Barthelemy had the opportunity to question her as to any discrepancies regarding the tape.

Furthermore, Barthelemy does not advise the Court as to what was on the 911 tape that was allegedly prejudicial to him at trial. In <u>Melendez-Diaz</u>, supra, the Supreme Court required that a defendant be allowed to cross-examine a forensic witness when that witness was offering evidence that proved an element of the crime against him.  In this case, the Court is hard-pressed to speculate as to what was on the 911 tape that was crucial to the State's proof of the elements of the charge Barthelemy was defending against.

Barthelemy's right to confrontation was not violated because he has not established that the evidence offered at trial, the

18

testimony of Kathy Robertson, was offered "against him." Instead, as Robertson stated, she was simply authenticating the tape. The Court in Melendez-Diaz specifically recognized that testimony or evidence offered for authentication purposes only, falls outside the scope of evidence prohibited under the Confrontation Clause. A witness is "permitted 'to certify to the correctness of a copy of a record kept in his office,' but [has] 'no authority to furnish, as evidence for the trial of a lawsuit, his interpretation of what the record contains or shows, or to certify to its substance or effect.'" Id. at 322 (quoting State v. Wilson, 141 La. 404, 409, 75 So. 95, 97 (1917) (citing State v. Champion, 116 N.C. 987, 21 S.E. 700, 700-701 (1895); 5 J. Wigmore, Evidence §1678 (3d ed. 1940)). Accordingly, Barthelemy's argument that his right to confrontation was violated, is without merit.

VI.   CONFLICT OF INTEREST (CLAIM 2)

Barthelemy complains that his constitutional rights were violated by a conflict of interest arising from the fact that his former counsel was employed by the same law firm representing his co-defendant, Danny Scott. Barthelemy explains:

> [He] was represented by ... Mr. Dwight Doskey ... from the very beginning through October 10, 2006, when [Mr. Doskey] left the Public Defender's office. During that same period, Danny Scott, was being represented by Kerry Cuccia, a member of the Capital Defense Project. Mr. Doskey, after leaving the OIDP [Orleans Indigent Defender Program], ... became an employee of the Capital Defense Project, which is the same office that brokered

19

a plea-bargain for Danny Scott, on or about June 13,
2008, in exchange for his testimony against petitioner.[28]

****

This is a matter where Mr. Scott and petitioner,
were both claiming that the other was the shooter, where
Mr. Doskey's representation and connections to the
Capital Defense Project, [were] a direct conflict of
interest.   Mr. Doskey's ethical responsibility to
petitioner did not end when he left the OIDP office. His
employment by the agency that brokered the deal for Mr.
Scott, demanded that the trial court address the conflict
of interest, to assure that there was no inadvertent
exchange or use of evidence obtained during the
representation of petitioner.[29]

The Supreme Court has long recognized that reversal of a
defendant's conviction may be warranted when his retained or
appointed counsel simultaneously represented one or more co-
defendants when the multiple representation created a conflict of
interest on counsel's part due to divided loyalties.  See, e.g.,
Holloway v. Arkansas, 435 U.S. 475 (1978); see also United States
v. Ramirez-Benitez, 292 F.3d 22, 29 (1st Cir. 2002) ("Representation
of co-indictees by members of the same law firm may create a
conflict of interest similar to that when a single attorney
represents two or more co-defendants.  See Burger v. Kemp, 483 U.S.
776, 783, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1986) (assuming without
deciding that two law partners are considered as one attorney.")).
However, a conflict of interest based upon multiple representation

---

[28]Rec. Doc. No. 4, pp. 34-35.

[29]Id. at 35.

is not presumed.  There must be a showing that the joint
representation created an "actual conflict," that is, "a conflict
that affect[s] counsel's performance - as opposed to a mere
theoretical division of loyalties."  Mickens v. Taylor, 535 U.S.
162, 171 (2002).

Barthelemy has failed to show any actual conflict of interest.
As the Louisiana Fourth Circuit determined:

> The record evidences that Mr. Doskey testified that he
> did not discuss the case with Mr. Cuccia;[30] that he never
> represented any of Defendant's co-defendants; and that he
> shared no information attained during his representation
> of Defendant.  Therefore, we find Defendant's right to a
> conflict free defense was not violated under these
> particular facts and circumstances, as the record does
> not demonstrate any prejudice to Defendant's defense as
> a result of Mr. Doskey's work with the Louisiana Capital
> Defense Project.

Barthelemy, 32 So.3d at 1011-1012.

Based on the above, the Court finds that Barthelemy suffered
no violation of his constitutional rights as there was no "actual"

---

[30]Mr. Doskey testified at a July 30, 2008 pre-trial hearing on
Defendant's Motion in Limine.  This testimony reveals that Mr.
Doskey worked at the Orleans Indigent Defenders Program ("OIDP")
from 1978 or 1979 until the fall of 2006.  Thereafter, Mr. Doskey
worked for the Capital Defense Project of Southeast Louisiana,
which is headed by Kerry Cuccia.  While working for OIDP, Sonny
Armond and Mr. Doskey represented Defendant in this case.  When Mr.
Doskey went to work for the Capital Defense Project, he and Mr.
Cuccia agreed that they would not communicate regarding their
respective clients.  Mr. Doskey testified that although no specific
steps were taken to ensure that Mr. Cuccia and Mr. Doskey would not
have physical access to each others' files for this matter, the two
men acted based on honor.

conflict of interest.  Barthelemy is not entitled to habeas relief on this claim.

VII.  <u>INVOCATION OF RIGHT AGAINST SELF-INCRIMINATION (CLAIM 3)</u>

Barthelemy argues that his constitutional rights were violated when the trial court allowed Ms. Lakeisha Williams to invoke her right against self-incrimination.

A witness's invocation of his or her Fifth Amendment privilege against self-incrimination clearly conflicts with a defendant's Sixth Amendment right to compulsory process.  Such a conflict, however, has long been "resolved in favor of the witness's right to silence."  <u>United States v. Perez</u>, 661 F.3d 568, 580 (11th Cir. 2011), <u>cert</u>. <u>denied</u>, 132 S.Ct. 1943 (2012) (quotation omitted); <u>see also</u> <u>United States v. Oyorzaval-Vera</u>, 184 Fed. Appx 398 (5th Cir.), <u>cert</u>. <u>denied</u>, 549 U.S. 1009 (2006) ("The Sixth Amendment right of compulsory process must yield to a witness's Fifth Amendment privilege against self-incrimination.") (Citation omitted); <u>United States v. Hernandez</u>, 962 F.2d 1152, 1161 (5th Cir. 1992) (same). A witness's Fifth Amendment privilege against self-incrimination overcomes a defendant's Sixth Amendment right of compulsory process when the witness has "reasonable cause" to invoke Fifth Amendment protection, <u>Hoffman v. United States</u>, 341 U.S. 479, 486 (1951), though the required showing in this regard is not high.  <u>Perez</u>, 661 F.3d at 580.

In addressing the instant issue on direct appeal, the Louisiana Fourth Circuit relied on state law which mirrors applicable federal law.

> When presented with a conflict between a defendant's right to present a defense pursuant to the Sixth Amendment of the U.S. Constitution and a potential witness's Fifth Amendment right against self-incrimination, the Louisiana Supreme Court "has consistently recognized the witness's right not to incriminate [herself]." State v. Haddad, 99-1272, p. 5 (La.2/29/00) 767 So.2d 682, 686. This right is "confined to instances where the witness has a reasonable cause to apprehend danger from a direct answer." State v. Coleman, 406 So.2d 563, 566 (La.1981), citing Hoffman v. United States, 341 U.S. 479, 487, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951). Moreover, "whereas an accused may assert the privilege as an excuse for refusing to take the stand, a witness may assert the privilege only with respect to particular questions." Coleman, 406 So.2d at 566 (emphasis added). The Coleman Court noted that there are "certain unique circumstances where it is evident from the nature of the question and the position of the witness that an answer or explanation of a refusal to answer any question could result in an injurious disclosure." Coleman, 406 So.2d at 566-567.

Barthelemy, 32 So.3d at 1013.

The Court finds that Ms. Williams had reasonable cause to invoke her Fifth Amendment privilege against self-incrimination. One basis was the fact that Williams' testimony could have been used against her in a homicide case pending against her.[31] As the Fourth Circuit explained:  "[T]he State's theory in [the open homicide] case was that Ms. Williams had persuaded young men to

---

[31]St. Rec. Vol. 4 of 6, p. 887.

kill for her.   Accordingly, the State asserted that it might be able to glean information from Ms. Williams' testimony showing some sort of a <u>modus operandi</u>."   <u>Id</u>.

Further, as the Fourth Circuit pointed out, testimony provided by other witnesses implicated Ms. Williams in Barthelemy's case.

> Det. Williams testified that Troy's wallet was discovered in Ms. Williams' bedroom in the house on Viola Street.  He also testified that he had discovered, during his investigation, that the wallet was placed there by Scott.  Scott denied ever touching the wallet.  Reginald, Ms. Williams' brother, testified that Ms. Williams was at the Viola Street house with her boyfriend when Defendant and he arrived after the murder.  Reginald pled guilty to accessory after the fact.

<u>Id</u>.

The Louisiana Fourth Circuit concluded:

> The fact that Ms. Williams was at the Viola Street house with Defendant, Scott, and her brother immediately after the murder, that the murder victim's wallet was found in Ms. Williams' dresser drawer, and that she washed the clothes of Scott that night, all indicate a possibility that Ms. Williams participated in the murder as an accessory after the fact.[32]  We find that the instant case is one of the "unique instances where it is evident from the nature of the question and the position of the witness that an answer or explanation of a refusal to answer any question posed could result in an injurious

---

[32]Barthelemy states that prescription had expired for purposes of charging Williams as an accessory after the fact.  Rec. Doc. No. 4, p. 40.  However, as evidenced by the transcript, the expiration of prescription was not established.   While defense counsel contended that the statute of limitations had expired, the State strongly contested the matter.  <u>See</u> St. Rec. Vol. 4 of 6, pp. 890, 892.

disclosure" by Ms. Williams.   Accordingly, the trial
court correctly allowed Ms. Williams to invoke her right
against self incrimination.   This argument merits no
relief.

Id. at 1013-1014 (footnote added) (citation omitted).

The state court's finding in this regard does not represent an

unreasonable application of federal law to the facts of this case.

Barthelemy is not entitled to habeas corpus relief on this claim.

VIII.   PROSECUTOR'S IMPROPER REMARKS (CLAIM 4)

Barthelemy claims that he received an unfair trial due to two

comments which the prosecutor made during closing remarks.[33]

Barthelemy describes the two comments as follows:

> The State argued that Reginald Williams lied.   The
> prosecutor stated that she would never call a witness who
> lied and that she did not call Mr. Williams because she
> was not interested in what he said....   The prosecutor
> also tried to testify about arrest procedures for sixteen
> year olds and what Mr. Scott's father had told her.[34]

There is no dispute that defense counsel objected to the

comments and the court sustained the objections.   Nevertheless,

---

[33]On direct appeal, Barthelemy, in addition to the two remarks
challenged herein, challenged three other comments made by the
prosecutor during closing arguments.   See Barthelemy, 32 So.3d at
1014.   In the instant action, Barthelemy only challenges the two
comments described above.

[34]Rec. Doc. No. 4, p. 47.   As a review of the pertinent
remarks, discussed infra at pp.27-28, reflect, the prosecutor made
no comment regarding what Mr. Scott's father told her.

Barthelemy claims he was prejudiced because the comments were heard by the jury.

A prosecutor's comment does not present a claim of constitutional magnitude in a federal habeas action unless it is so prejudicial that the trial was rendered fundamentally unfair in violation of the Due Process Clause. <u>Jones v. Butler</u>, 864 F.2d 348, 356 (5th Cir .1988). "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned. The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986) (citations and quotations omitted); <u>accord</u> <u>Rogers v. Lynaugh</u>, 848 F.2d 606, 608 (5th Cir. 1988); <u>Bell v. Lynaugh</u>, 828 F.2d 1085, 1095 (5th Cir. 1987). The prosecutor's remarks must be evaluated in the context of the entire trial. <u>Greer v. Miller</u>, 483 U.S. 756, 765–66 (1987) (citing <u>Darden</u>, 477 U.S. at 179); <u>Kirkpatrick v. Blackburn</u>, 777 F.2d 272, 281 (5th Cir.1985).

District courts in the Fifth Circuit must apply a two-step analysis when reviewing claims of prosecutorial misconduct. <u>United States v. Wise</u>, 221 F.3d 140, 152 (5th Cir. 2000); <u>United States v. Lankford</u>, 196 F.3d 563, 574 (5th Cir. 1999). First, the court must determine whether the prosecutor made an improper remark. <u>Wise</u>,

221 F.3d at 152.   "If an improper remark was made, the second step is to evaluate whether the remark affected the substantial rights of the defendant."   Id.   A habeas corpus petitioner "must demonstrate that the misconduct [was] persistent and pronounced or that the evidence of guilt was so insubstantial that the conviction would not have occurred but for the improper remarks."   Jones, 864 F.2d at 356; accord Hoque v. Scott, 874 F.Supp. 1486, 1533 (N.D. Tex.1994).   Under this test, a petitioner must demonstrate that the comment rendered his trial "fundamentally unfair," by showing "a reasonable probability that the verdict might have been different had the trial been properly conducted."   Rogers, 848 F.2d at 609 (footnote and citations omitted).

For purposes of federal habeas review under the AEDPA, Barthelemy's claim of prosecutorial misconduct presents a mixed question of law and fact.   Brazley v. Cain, 35 F. App'x 390, 2002 WL 760471, at *4 n. 4 (5th Cir. Apr. 16, 2002) (citing United States v. Emuegbunam, 268 F.3d 377, 403–04 (6th Cir.2001); Jones v. Gibson, 206 F.3d 946, 958 (10th Cir.2000); United States v. Noriega, 117 F.3d 1206, 1218 (11th Cir.1997); United States v. Spillone, 879 F.2d 514, 520 (9th Cir.1989)).

27

The remarks at issue arose in connection with the prosecutor's rebuttal closing argument.[35]  A review of trial transcript reflects, in pertinent part, the following closing comments:

MS. FAIA [prosecutor]:

> Reginald lied, as he showed you on the stand.  He lied to the police.  He lied later to another Assistant District Attorney who interviewed him.  He lied to you when he denied making the statements to the police that you heard him make on that tape.  I will not put a witness on the stand that I know to be a liar.

MR. FLEMING [defense counsel]:

> Objection, your Honor.

THE COURT:

> Let's keep it to the evidence.  Go ahead.[36]

* * * *

MS. FAIA:

> I will briefly tell you that when a 16 year old is arrested there is a probable cause hearing that's held. Probable cause was found that Danny Scott committed murder.

MR. FLEMING:

> I'm going to object, Judge.

THE COURT:

> You're out of the evidence now.

MS. FAIA:

> The minute probable cause is found - -

MR. FLEMING:

> Judge - -

THE COURT:

> You're out of the evidence.

---

[35]There were no objections to the prosecutor's initial closing remarks.  St. Rec. Vol. 4 of 6, p. 909.

[36]Id. at p. 914.

MS. FAIA:

      Your Honor, he opened the door and he tried to say
    that Danny was not in the court - -

MR. FAULKNER [defense counsel]:

    Judge - -

THE COURT:

      The objection has been sustained.  Let's move on.[37]

    The Court finds that these sparing and few comments by the prosecutor, though objectionable, did not so infect the trial as a whole that it was rendered fundamentally unfair.  The prosecutor's comments were limited and were neither persistent nor pronounced.

    The record contains ample evidence upon which the jury was able to conclude that Barthelemy was guilty of shooting the victim. In particular, Crystal Smith clearly identified Barthelemy as the shooter.  Smith estimated that at the time of the incident she was only two feet away from the shooter and positively identified Barthelemy as the one who shot the victim.  Smith identified Barthelemy in court and in a six-picture photographic identification.  Smith stated that she would "never forget that face or his eyes."[38]

    Based on the above, the Court finds that the state courts' rejection of the instant claim does not represent an unreasonable

---

[37]Id. at pp. 915-916.

[38]Id. at pp. 657-658, 662-663, 668.

application of federal law to the facts of this case.  Barthelemy is not entitled to relief on this claim.

IX.  <u>INSUFFICIENCY OF EVIDENCE (CLAIM 5)</u>

Barthelemy claims that the testimony of Danny Scott and Crystal Smith was insufficient to support his conviction. Barthelemy discounts the credibility of Scott because he was "an accomplice, who had made a deal in exchange for his testimony against petitioner."[39]  Barthelemy discounts the veracity of Smith's testimony because her "descriptions were inconsistent with her identification."[40]  Specifically, Smith's initial description of the shooter and his accomplice, in terms of their heights, did not match up with her later identification of Barthelemy as the shooter and Scott as his accomplice.

In addressing the instant issue, the Louisiana Fourth Circuit relied on applicable federal law along with corresponding state law.

> In reviewing sufficiency of the evidence arguments, this Court has recognized the <u>Jackson v. Virginia</u> standard of determining whether a rational trier of fact, in viewing the evidence in the light most favorable to the prosecution, could find the Defendant guilty beyond a reasonable doubt:
>
> > In assessing the sufficiency of evidence to support a conviction, the reviewing court must

---

[39]Rec. Doc. No. 4, p. 53.

[40]<u>Id</u>. at p. 55.

determine whether, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 309, 99 S.Ct. 2781, 2784, 61 L.Ed.2d 560 (1979); State v. Rose, 607 So.2d 974, 978-979 (La. App. 4th Cir.1992), writ denied, 612 So.2d 97 (La.1993).  However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court is not permitted to consider just the evidence most favorable to the prosecution; it must consider the record as a whole since that is what a rational trier of fact would do.  If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted.  The fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall,[supra].

State v. Everett, 99-1963, pp. 5-6 (La. 4 Cir. 9/27/00), 770 So.2d 466, 470, reversed on other grounds, 2000-2998, 816 So.2d 1272 (La.5/14/02).

Furthermore, this Court has acknowledged that a trier of fact's determination with regard to credibility of a witness is entitled to great weight:

It is not the function of the appellate court to reassess the credibility of witnesses or to reweigh the evidence; the reviewing court's function is to determine the constitutional sufficiency of the evidence presented.  State v. Johnson, 619 So.2d 1102, 1109 (La. App. 4 Cir. 5/13/93), writ denied, 625 So.2d 173 (La. 10/1/93).  Credibility determinations, as well as the weight to be attributed to the evidence, are soundly within the province of the fact finder.  State v. Brumfield, 93-2404 (La. App. 4th Cir.1994), 639 So.2d 312; State v. Garner, 621 So.2d 1203 (La. App. 4th Cir. 1993), writ denied, 627 So.2d 661 (La. 1993).

> Moreover, conflicting testimony as to factual matters is a question of weight of the evidence, not sufficiency. <u>State v. Jones</u>, 537 So.2d 1244, 1249 (La. App. 4 Cir. 1989); <u>Tibbs v. Florida</u>, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). Such a determination rests solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witness. <u>Id</u>. A trier of fact's determination as to the credibility of a witness is a question of fact entitled to great weight, and its determination will not be disturbed unless it is clearly contrary to the evidence. <u>State v. Vessell</u>, 450 So.2d 938, 943 (La. 1984).

<u>Id</u>., 99-1963, pp. 8-9, 770 So.2d at 471.

> Finally, when the key issue is whether the defendant was the perpetrator, rather than whether a crime was committed, the State must negate any reasonable probability of misidentification. <u>State v. Neal</u>, 2000-0674, p. 11 (La.9/21/01) 796 So.2d 649, 658. Notably, the Louisiana Supreme Court has held that a positive identification by only one witness is sufficient to uphold a conviction. <u>Id</u>.

<u>Barthelemy</u>, 32 So.3d at 1015.

As for the alleged untrustworthiness of Danny Scott's testimony, the jury was aware of the fact that he made a deal with the State in exchange for his testimony. On direct examination, Scott admitted that he was testifying, in part, because of "the deal" he made with the State. In exchange for his testimony, he was allowed to plead guilty to manslaughter and received a 15-year

sentence.[41]   This fact was reiterated on cross-examination.[42] Further, the jury was made aware of the fact that Scott was a convicted felon, having been convicted for simple robbery.[43]

Thus, the basis of Scott's alleged untrustworthiness was placed "front and center" before the jury.  That the jury found his testimony credible is not a matter with which this Court can quibble.  Credibility determinations are squarely within the province of the jury.  United States v. Young, 107 Fed. Appx. 442, 443 (5th Cir. 2004) (citing United States v. Garcia, 995 F.2d 556, 561 (5th Cir. 1993)).  All credibility choices and conflicting inferences must be resolved in favor of the verdict.  Ramirez v. Dretke, 398 F.3d 691, 695 (5th Cir. 2005).

As for the alleged unreliability of Crystal Smith's testimony, the difference between her initial description of the shooter and her later identification of Barthelemy as the shooter was repeatedly brought to the jury's attention.  As the Louisiana Fourth Circuit noted, "[a]t the time of his arrest, Defendant was 5'5" tall and twenty-one years old, weighing approximately 150 pounds, while Scott was 5'4" and weighed approximately 125 pounds at the time of his arrest."  Barthelemy, 32 So.2d at 1016.  A

---

[41]St. Rec. Vol. 4 of 6, pp. 766-767.

[42]Id. at p. 799.

[43]Id. at p. 802.

review of the trial transcript reflects that Smith admitted again and again that she originally said the shooter was shorter than the non-shooter.

> Q.  And you testified at that proceeding that the shooter was short . . . ?
>
> A.  I believe so.[44]
>
>                                        ****
>
> Q.  [Do] your remember testifying, "I told them that the shooter was shorter than the other guy"?
>
> A.  Yes.
>
> Q.  Is that what you testified to?
>
> A.  Yes.[45]
>
>                                        ****
>
> Q.  On that day Detective Williams was asking you questions.  Questions concerning what happened, descriptions of the perpetrators, and what not, correct?
>
> A.  Yeah.
>
> Q.  And you told him that it was the shortest one that pulled out a gun and told Troy to give up his car keys?
>
> A.  Yes.
>
> Q.  And you told Detective Williams on this statement later that morning that it was the shorter person that shot Troy Cacioppo?
>
> A.  Yes, I told them that he was a little shorter.[46]
>
>                                        ****
>
> Q.  [A]t approximately 6:00 in the morning, Detective Williams asked you what the second person, the non-shooter looked like, correct?
>
> A.  Uh-huh (affirmative response).

---

[44]Id. at p. 675.

[45]Id. at p. 680.

[46]Id. at p. 683.

Q.  Do you remember telling the detective that that
person was taller and darker?

A.  I remember telling him - - I remember he was a bit
taller . . . .[47]

Once again, the deficiency of Smith's identification, i.e.,
the fact that she said the shooter was shorter then later
identified Barthelemy, the taller of the two perpetrators, as the
shooter, was brought to the jury's attention.  The jury, based upon
its verdict, nevertheless found Smith's identification of
Barthelemy as the shooter to be credible, a finding that was
properly within the scope of the jury's review.

## **RECOMMENDATION**

For the foregoing reasons, it is **RECOMMENDED** that the petition
of Keith Barthelemy, for issuance of a writ of habeas corpus under
28 U.S.C. §2254 be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed
findings, conclusions, and recommendation contained in a magistrate
judge's report and recommendation within fourteen days after being
served with a copy shall bar that party, except upon grounds of
plain error, from attacking on appeal the unobjected-to proposed
factual findings and legal conclusions accepted by the district
court, provided that the party has been served with notice that

---

[47]Id. at p. 687.

such consequences will result from a failure to object. <u>Douglass v. United Services Auto. Assoc.</u>, 79 F.3d 1415 (5th Cir. 1996)(<u>en banc</u>).

New Orleans, Louisiana, this <u>26th</u> day of <u>December</u>, 2013.

ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE